Good morning. May it please the Court. Alexander Teofsky for the Plaintiff Appellant. I'd like to try to take two minutes for a rebuttal if I can. Okay. There are three reasons here that the District Court's grant of summary judgment should be reversed. First, the FCC's 2008 order provides for a liability of creditors where their third-party debt collectors violate the TCPA when trying to collect the debt on the creditor's behalf. The second reason is that federal common law principles of ratification apply here and operate to hold USA funds at least potentially liable. And third, the common law principles of implied actual authority, there's also sufficient evidence that a jury could find that those are enough to hold USA funds liable. So starting with the 2008 order, the FCC has interpreted the TCPA to apply to debt collectors, and they've got a pretty wide leeway. If someone signs up for a loan and they put their phone number down on the loan documents, that operates as permission to call them with an auto dialer. That's considered consent. The flip side of that is that it doesn't operate to call them on any phone number. It operates to call them on the phone number provided. And the FCC says, look, the creditors are the ones that are in the best position to police collection efforts on this debt that they own. So I would have thought that after our decision in Gomez that this all would have been cast off on the common law principles, because what the FCC said in that order was, yeah, you can be liable if the debt collector is calling on your behalf. There has to be an agency relationship, and we're going to look to common law principles that seems to take us out of the regs and take us into your points 2 and 3. So I think that certainly points 2 and 3 could apply here. I'll just say that Gomez and the 2013 FCC order and all of that were about telemarketing, not about the debt collection context. So there is an argument that those are kind of different situations. I just didn't see that the regulation gave you any independent basis. It seems to reference agency principles as found in the common law, and that seems to get to your other arguments. But I don't see that the regulation in and of itself gives you any additional rights that aren't found in common law. I understand that, although I think that reasonable minds can disagree on that question. But it's true that the Court need not make that broad finding, because the Federal common law principle of agency here do give enough. There's enough evidence that a jury could find that there was agent here, so the first of those principles. Could you explain your argument that there's ratification here? Yes. So this Court recently clarified the test for ratification. That's in Christensen v. Credit Payment Services, which was released after the briefing in this case. There's a 28-J letter. And in that case, the Court sets out that principle in the TCPA context. The act must be capable of ratification. That is, it must be either done by an agent or by someone purporting to act as an agent. Here we have U.S. We have the collectors here purporting to act as USA Funds' agent. They collect money on USA Funds' behalf. They can enter into loan modification agreements on USA Funds' behalf. So whether or not there's a, you know, I don't know what it means to say that there is an actual agency relationship, but whether or not you can prove a preexisting relationship, it's clear that they're purporting to act as the agents. Okay. So where's the ratification on the part of USAF? So that's the second point is accepting the benefit of the transaction. That's the second element to ratification. And the third element is knowledge. So with the accepting the benefit, we know that they're getting a benefit here because the callers are collecting debt from their behalf. Right. But if they don't know, if they don't, I mean, sure, they might be getting an indirect benefit here because the debt's going to be collected. But if they have no idea that you're engaging, somebody's engaging in extortion or engaging in violations of something less than extortion under the TCPA, then where's the ratification? So the strict liability, if they collect the debt and I accept the debt, I'm now liable for everything they've done, even if I have no knowledge of it? Of course not. And that's the third element of ratification, which I think Your Honor is referring to, which is the knowledge. And so the knowledge you have to have is either knowledge of material facts or, as the Court held in Christensen, accepting the risk of the lack of knowledge of material facts. And that's what we have here, accepting the risk of lack of knowledge. So here, USA Funds knew that the collectors were using auto-dialers to testify to that. They knew that the collectors were using skip tracing. That is, they were using this process to find out other phone numbers of the debtor. We know that because they were required to do it because they admit that they did it. Right. Who admitted they did it? USA Funds admitted that. I don't think it is contested here that skip tracing was used. And my client testified. Did USAF know that they were using skip tracing? Yes. They did. It's required by federal law, as I'm sure my friend will tell you when she gets up here. Your friend. Are you splitting argument? No, no, sorry. My opponent. Okay. And with — and so knowing those two things, that's sort of the perfect storm for TCPA violations, right? When you've got auto-dialers and you're calling these numbers that you haven't checked whether you have consent to call with auto-dialers, this is enough information that USA Funds should have said, ha, well, what's going on here? But then on top of that, USA Funds conducted yearly or even more than once a year audits of the collectors. That is, USA Funds would go — would send a corporate representative out to audit the collecting practices. That included — Wait. Were they auditing — were they auditing the debt collector or they auditing the intermediate? The debt collectors. Not the intermediate. USA Funds audited the debt collectors specifically, including shadowing the callers themselves. That's on a supplemental excerpt of Record 139 provides for USA Funds to come shadow collectors. And there's testimony from USA Funds that they would — they would see a collector call a wrong number, and they would note that down in their audit findings, and then they'd offer a corrective action, take that number out of the dialer. That's on excerpts of Record 32. And that's enough information for USA Funds to have accepted the risk that they didn't know if the — their collectors had properly gotten consent to auto-dial these numbers. And yet they kept on accepting the benefits. In fact, they even knew that some of their collectors had been sued for violations of the TCPA. And still, they said when they find that out, they do nothing. And that's — that's enough information such that USA Funds ratified the actions. The acts were capable of ratification. There was a benefit to them. And they had knowledge enough that it wasn't just strict liability. It wasn't just, you know, these creditors — excuse me, these collectors operating totally independently and doing — doing things that USA Funds had no idea about. USA Funds either — either knew or — or should have known. And we don't have to prove that, you know, with an incredibly high degree of certainty of summary judgment. We just have to show that there's enough evidence there that a jury could have found that. And here I — it's difficult for me to say that there's — that there's any question about that. But a jury could have found that. And when the district court examined this issue, it didn't even get to that question on ratification because it implied a standard from an unpublished decision of this court that this court has since clarified does not apply the way the district court applied it. And so summary judgment on the ratification matter was — was certainly inappropriate. Finally, the last issue here is also there's a theory of implied actual authority, which as this court recently clarified in the Jones case, the amended opinion in that case is when a principal gives general directions to an agent and says, do this task for me. Here are your general directions. They are then liable for the agent's actions when engaging in those. And the discussion in the briefs was largely circled — it circled around the question of control. But the Jones case made clear that while manner and means control, like with an employee-employer relationship, is a way to show agency, it analyzed that separately from the question of implied actual authority. Implied actual authority is, as I said, general directions and the agent complies with them. Here we've got general directions. They're told — the USA funds tells these collectors, go collect this debt, and then the collectors do that. USA funds watches over their shoulder as they do. And your contention is that USAF is telling the debt collectors directly, not — not through Navien Solutions? You — I — I suppose it is through Navien Solutions, but the — Well, supposing that it's through Navien Solutions makes this a very, very different case from what you've just said. With respect to implied actual authority, I don't think it does, because the — so implied actual authority depends on a representation from the principal to the agent. And here, USA funds, in their contract with Navien, gives instructions not to — not to Navien, but to the collector specifically. The contract contemplates that collectors will be hired, and here's how the collectors will be governed, and here's what the collectors will do. So those instructions don't — won't really — don't really come from Navien. They come from — they come from USA funds. And that's made clear, again, by the audits. USA funds shows up. The collectors, I think, rightfully assume that if USA funds doesn't tell them to stop doing what they're doing, then they're acting consistently with — with USA funds' directions. Kagan. Well, let me ask. You argued implied — actual implied authority. You did not argue actual authority. Is that correct? It's implied actual authority as opposed to express actual authority. So express actual authority would have been if USA funds had told the collectors, go violate the TCPA on our behalf. You're not going to find that at any of these cases. Did you argue or discuss — I may have missed it — the subjective standard of actual authority? I'm not — I'm not sure exactly what the — I'm not sure exactly what — Well, the restatement of agency 202 says that actual authority requires that the agent's belief be reasonable and objective standard, and that the agent actually held the belief a subjective standard. What — I didn't see anybody argue the subjective standard, and what evidence in the record shows that the debt collectors actually held the belief that they had the authority to violate the TCPA. How could you present that evidence without deposing the debt collectors? I think you can. So the question is not did they have specific express directions to violate the TCPA. The question is that is did the collectors, were they given implied authority to do a task, broad authority to do the task in the way that they saw fit. And the evidence here shows that they were. Even without their testimony, we know that they collected money from debtors and then remitted it back to USA Funds. Now, they wouldn't have done that if they didn't think they had authority to do so. They entered into payment plans, into contract modifications. Again, that demonstrates that they believe that they're tasked with a certain task from USA Funds and that they're going to go about doing it. I don't think that we need testimony from them as to their state of mind to have enough circumstantial evidence for a jury to conclude, no, obviously the collectors aren't going to make these debt collection calls out of the goodness of their heart and then give money back to USA Funds, right? Either they're lying and they're scammers and then they're going to keep the money. That's not in the record. Or they're doing they believe reasonably that they have authorization to do what they're doing, and they continue to do it. And I think that's what's going on here. Okay, you've got a couple of minutes. Do you want to save those? I will. Thank you, Your Honor. Good morning, Your Honors. Lisa Simonetti for USA Funds. I would just like to reset the stage for a moment to talk about the relationships that actually exist here among these companies as reflected in the record. As stated in the brief, USA Funds is a federal guarantee agency. It works under the Federal Family Education Loan Program. It has a limited number of employees, about 150 employees, and it contracts with Navient Solutions for a number of different services. We addressed this in the brief. It's 12 different types of services, loan disbursement, status management, various things that come up with respect to these defaulted felt loans. And this collection piece is only one of the 12. It's not a focus of the agreement. Navient Solutions then contracts with the vendors. Only Navient has the ability to hire the vendors. Only Navient has the ability to terminate the vendors.  So that's the structure. USA Funds to Navient to the vendors. And those contracts recite the — Is this just a device for protecting USAF? No, not at all. Under the regulations that govern the felt program promulgated under the Higher Education Act, not only is USA Funds permitted to contract out, it's expected that it will contract out to a servicer because it is not, in fact, a loan servicer. Right. But a servicer, it could contract directly with a debt collector, right? I suppose it could, but USA Funds doesn't have the expertise. It doesn't have a staff that has any loan servicing experience. It doesn't have staff that could handle the entirety of this relationship. It's simply a guarantee agency. But USA Funds had the ability to file Navigon. And why doesn't that ability for them to file Navigon, if the debt collectors weren't collecting, Navigon or Navient, I should say, could fire the debt collectors, why doesn't that weigh in favor of an agency relationship? Realize we have USA, we have Navient and the debt collectors. And USA could fire Navient. And Navient could fire the debt collectors. That's true. But what we're looking for here in terms of vicarious liability theory is an agency relationship or something of that sort that would exist between USA Funds, the only defendant here, and the collectors. Why is there no ratification on the record here or the possibility of proving ratification? We heard that there's evidence in the record that your client, United Student Aid Funds, gets the benefit of the action of the collectors, that there's evidence that they know the practices that are being used by the debt collectors, they know that there's skip tracing, and that skip tracing will produce, among other things, cell phone numbers. They're accepting the benefits of that. That sounds like ratification to me. Why isn't it ratification? Well, first of all, certainly there is benefit that flows from collecting on these defaulted loans. Frankly, that benefit flows to the government and to us as taxpayers because these are all taxpayer-backed loans at some level. I think you just told me that benefit part of the test has been satisfied. Okay. Okay. And then with respect to the issue of skip tracing, the regulations do require skip tracing so that contact can be made with defaulted borrowers. But what is the false premise here is that auto dialing plus skip tracing will necessarily result in a TCPA violation because one can — Wait a minute. Wait a minute. Don't say TCPA violation, but rather say that skip tracing will necessarily produce some calls to cell phones. Is that true? Yes. Sure. Good. So if they're to cell phones and the owner of the cell phone has not consented, then we've got a problem. No, because only the auto-dialed call to a cell phone would result in a violation. A manual call to a cell phone would not result in a violation. Oh, I left it out. Are you saying that there are no auto dials being done here? Your Honor, this is not — there was no deposition testimony taken from the collectors, that their position vis-à-vis subpoenas and everything else was that all of these calls were manually dialed. So that's why it's a false premise to say that because these numbers — Wait a minute. I've totally misunderstood the record here. Okay. I had thought that it was established that there were some auto dials taking place. That's not in the record? No, Your Honor. That is not true. I think that there has been testimony that USA Funds understands that some of the vendors have auto dialers, but there is no testimony here with respect to Henderson or anyone else that one of these five collectors auto dialed her or anyone else. Their position is that the calls are manual. So that equation, the skip tracing plus dialing, that's where it's a false conclusion that this necessarily is some issue. Okay. I'll ask you to assume for the moment, although you're obviously objecting to that. I'll ask you to assume for the moment there's sufficient evidence in the record from which it could be determined that there was auto dialing. I understand you object to that, but accept that for the moment. Okay. I'm accepting it because you're asking me to. Okay. Okay. Yeah, that's right. I'm not asking you to concede that. If there is auto dialing, why is there not ratification? Because if there's auto dialing, then my assumption would be,  You can auto dial — Consent from whom? From the person being called. No. You're sliding off the hypothetical. Okay. These are calls that are going to people to their cell phones. They have not — there's no independent evidence of consent. Okay. They're auto dialing to the cell phone for debt collection. Okay. And the money, when it's collected, is going back to your client. Okay. Why is there no ratification? If all of those things were true and in the record, which they're not, then you're right. That would potentially be notice of TCPA violations. But again, if you look at the test here, stated in Christensen, you know, there are 300,000 borrowers in this U.S.A. funds portfolio, $6 billion, whatever the number is. And the Court stated, you know, the knowledge that an agent is engaged in otherwise commonplace marketing, you know, there has to be a threshold at which there is a red flag, not a one-off instance where a vendor might have been sued, and who knows what the merit of that allegation would even be. So, no, I do not believe that on this record any reasonable jury could find that there was ratification. Okay. But let me make sure you and I are on the same page here. Okay. Because it may come down then to what's in the record in terms of facts, not in terms of what the law is. If there is sufficient evidence in the record from which a jury could reasonably conclude that there was auto-dialing to cell phone numbers for which there had been no independent basis for consent, and the result of the auto-dialing was to produce money that goes back to your client, that there is ratification. And your client knows that there's the auto-dialing going on. I have to add that, of course. I think what they would have to show is that auto-dialing not only was happening, but really was happening on a significant basis. Oh, boy. That just changed your argument. No, I don't think so. I mean, this ---- Okay. But let's say on a significant basis. I'm not going to ---- Okay. We won't worry too much about the definition of significant for the moment. Okay. But the Court says, this Court says red flag in Christensen. So that suggests to me there has to be a red flag and not something less than a red flag. Well, red flag meaning no. I'm assuming knowledge. So I assume that your client knows what the practices are. Okay. And that the practices include auto-dialing to cell phone numbers for which there's no independent basis for consent. Some of that auto-dialing produces money, and the money goes back to your client. Is that ratification? I think from your perspective, that would very clearly be ratification. And I think ---- What do you mean from my perspective? I'm asking from, is that the result? I'm not asking you to concede those facts. But given those facts, is there ratification? Under those facts, as you describe them, and that that's an extreme situation, then that probably would be ratification. Okay. But that's not present here at all. But you're saying the facts just don't support it? Not at all.  Is there any claim in the complaint that Ms. Henderson was auto-dialed? Yes, she does contend that. That's the allegation that is written into the complaint, but the vendors state that the calls were manual. And, again, since there was no discovery taken of the collectors, there was no examination of their systems, there was no inquiry into how they're used, how they're configured, how they're set up, who uses them, none of that is in the record whatsoever. And, of course, the burden is on plaintiff to prove the use of an ATDS. Well, there was record in the record that U.S. funds regularly reviewed the performance and made recommendations to Navion about changing underperforming debt collectors. Why doesn't this meet the threshold needed to establish an agency relationship? Because, well, there are two things there. First, simply in terms of performance, I think that U.S.A. funds, all of the parties to this loan transaction, should have the expectation that the collection efforts are successful, without a doubt. I mean, we all have an interest in that. And, second, what U.S.A. funds really is doing in terms of monitoring performance is the audit that we discussed, which goes to the FELP requirements. There are very detailed FELP requirements, and connection with servicing and collection is one piece of that. So they have to do the regular audit under the regs to determine whether those FELP criteria are being met. All right. Thank you. Okay. Anything else? Thank you very much. Okay. Response. Yes. Thank you. So what's on the record? I've got it right here. My client, Ms. Henderson, testified that she received calls on the order of every 30 to 40 minutes, that when she would pick up the phone, there would be a prerecorded voice. Please hold for a representative. And that only on one occasion of the many, many times she was called did she pick up and actually hear a live person. Those are hallmarks of auto-dialed calls. They're not sitting there dialing. There's nobody sitting there dialing the call with the finger, and then the person's getting shunted off to a machine. That's entirely implausible, at the very least enough for a jury to conclude it. On top of that, USA Fund's excerpts of Record 38 testifies that they knew that all of the collectors, except for one, used auto-dialers. You know, that's at the very least that creates an issue of material fact as to this question. So I'm not sure where the idea that this isn't in the record came from. With respect to our burden as far as proving the use of an auto-dialer, they didn't move for summary judgment saying that there was no auto-dialer here. That burden on summary judgment is triggered by them pointing out a lack of evidence. There's still the initial burden on a defendant moving for summary judgment. They didn't raise that here. We had no obligation to come forth with detailed evidence on the types of machines and everything that were used, because that simply wasn't brought up. And finally, as far as consent, consent's an affirmative defense. There's no evidence in the record at all of my client's or anybody's consent to be dialed on any number other than the number my client put down on her loan application, which isn't the number that they called her on. Unless there's any further questions, I can take my seat. Okay, thank you very much. Thank you both sides for your argument. Henderson v. United Student Aid Funds submitted for decision, and that concludes our argument for the morning.
judges: D.W. Nelson, W. Fletcher, Bybee